IN THE
# ARIZONA COURT OF APPEALS
DIVISION TWO
_____

SHANE NOEL JONES, A QUALIFIED ELECTOR; VICTORIA CRANFORD,
A QUALIFIED ELECTOR AND RESIDENT OF GRAHAM COUNTY,
*Plaintiffs/Appellants*,

*v.*

RESPECT THE WILL OF THE PEOPLE: GRAHAM COUNTY VOTERS & THE
ARIZONA PUBLIC INTEGRITY ALLIANCE ENCOURAGES A NO VOTE ON MASSIVE
MARIJUANA EXPANSION IN OUR AREA, REAL PARTY IN INTEREST
GEORGE KHALAF, AS ITS CHAIRMAN; WENDY JOHN, IN HER OFFICIAL CAPACITY
AS GRAHAM COUNTY RECORDER; HANNAH DUDERSTADT, IN HER OFFICIAL
CAPACITY AS DEPUTY CLERK/ELECTIONS DIRECTOR; DANNY SMITH,
PAUL R. DAVID, AND JOHN HOWARD, IN THEIR OFFICIAL CAPACITIES
AS MEMBERS OF THE BOARD OF SUPERVISORS FOR GRAHAM COUNTY,
*Defendants/Appellees*.

No. 2 CA-CV 2022-0065
Filed August 25, 2022
_____

Appeal from the Superior Court in Graham County
Nos. S0500CV202100076 and S0500CV202100077 (Consolidated)
The Honorable John R. Hannah Jr., Judge

**AFFIRMED**
_____

COUNSEL

Herrera Arellano LLP, Phoenix
By Roy Herrera, Daniel A. Arellano, and Jillian L. Andrews

and

Snell & Wilmer L.L.P., Phoenix
By Colin P. Ahler
*Counsel for Plaintiffs/Appellants*

Rose Law Group PC, Scottsdale
By Logan V. Elia and John H. Sud
*Counsel for Defendants/Appellees*

---

**OPINION**

---

Vice Chief Judge Staring authored the opinion of the Court, in which Chief Judge Vásquez and Judge Brearcliffe concurred.

---

S T A R I N G, Vice Chief Judge:

**¶1**        In this expedited election appeal, Shane Jones and Victoria Cranford (collectively, Jones) challenge the trial court's final judgment in favor of Respect the Will of the People:  Graham County Voters & The Arizona Public Integrity Alliance Encourages a No Vote on Massive Marijuana Expansion in Our Area; its chairman, George Khalaf; and various Graham County officials (collectively, RWP), denying Jones's request for injunctive relief and permitting referendum petition REF-02-2021 to be placed on the November 2022 ballot.[1]  Jones raises two principal issues on appeal:  (1) whether the court erred in concluding the petition complied with A.R.S. § 19-101(A) by including the title twice and the entire text of the zoning measure; and (2) whether the court erred in concluding RWP had obtained enough valid signatures to place the measure on the ballot.  By order dated July 21, 2022, we affirmed the trial court's judgment, indicating that a formal written disposition would follow.  This opinion is that disposition.

**Factual and Procedural Background**

**¶2**        In June 2021, the Graham County Board of Supervisors approved the rezoning of a portion of land from "general use" to "unlimited manufacturing" for the purpose of establishing a medical marijuana cultivation facility.  The following month, RWP filed a referendum petition (designated as REF-02-2021) opposing the rezoning

---

[1]Below, Jones "voluntarily dismiss[ed] any allegations of errors or omissions on the part of any County Defendant," and the Graham County officials "remain nominal Defendants only to the extent that they are necessary to effectuate any injunctive relief granted by the Court."

and referring the matter to Graham County voters in the November 2022 election. Later that month, RWP submitted 2,288 signatures supporting the petition. In August 2021, after verifying randomly selected signatures, the Graham County Recorder certified the petition for the ballot.

¶3        Also in August, Jones filed a verified complaint pursuant to A.R.S. §§ 19-122(C) and 19-141(D), alleging RWP had failed to obtain a sufficient number of valid signatures on the referendum petition.[2] In addition, Jones alleged RWP had failed to comply with the petition requirements under § 19-101(A) by including "more than the 'title' of the measure, its number, and the meeting and body at which it was passed," which Jones asserted was "misleading." Jones requested an injunction prohibiting Graham County officials from placing the petition on the November 2022 ballot.

¶4        RWP subsequently filed a motion to dismiss Jones's complaint. First, RWP argued Jones was barred by the statute of limitations from challenging the signatures on the referendum petition. Second, regarding the allegation that the petition was "misleading," RWP asserted Jones had failed to state a claim upon which relief could be granted. Further, RWP maintained that the petition "strictly complies with the relevant statutes" because it included the "entire name of the Rezoning Application as described in the Board's official meeting minutes," consistent with A.R.S. § 19-121(E). The trial court denied the motion to dismiss in part, rejecting the statute of limitations argument. The court, however, granted the motion to dismiss "to the extent that [Jones] challenge[d] the text of the 'petition for referendum' section of the subject petitions," finding that the petition was "within the bounds of what is permissible."

¶5        Shortly thereafter, Jones filed a motion for summary judgment on the signature challenge. The parties agreed that RWP needed 1,064 signatures to place the referendum petition on the ballot and that it had collected 2,288 total signatures. Jones, however, maintained that 1,308 of the signatures were "statutorily deficient," leaving only 980 that were valid. Jones reasoned that 230 signatures were "invalid based on facial deficiencies or lack of a corresponding voter registration record [in] Graham County." Jones further asserted that 1,077 signatures were

---

[2]Jones and Cranford each filed a separate complaint, but the trial court consolidated the matters.

"deficient" because the circulator who had collected them, Keith Leonard, "issued a false circulator affidavit about where he lived."[3]

¶6            After oral argument, the trial court denied the motion for summary judgment as to the 1,077 signatures affected by the circulator challenge, finding Leonard's address to be a factual question. The court also denied the motion as to ninety-three signatures that had addresses on the referendum petition that did not match those in the voter rolls and as to six signatures that had a missing year in the date line. But the court granted the motion for summary judgment as to eighty-seven signatures not appearing in the Graham County voter rolls, thirty-one signatures with missing or illegible information, ten signatures that listed a post-office box instead of a residential address, three signatures with a date-related deficiency, and ten signatures that were duplicative.[4]

¶7            In April 2022, the trial court held a bench trial to address the remaining issues. After considering the evidence and argument, the court found that the address Leonard had listed on the circulator affidavit was not his "actual residence" and, therefore, it concluded all the petition sheets circulated by Leonard were invalid.

¶8            The trial court then heard argument concerning the remaining signature issues. Jones asserted that, during trial preparations, he had discovered an additional twelve signatures that were not in the Graham County voter rolls and argued that they should be covered by the court's earlier grant of summary judgment on that issue. According to Jones, taking those additional signatures into account would mean RWP had failed to meet the 1,064 threshold. The court ordered Jones to file a supplemental motion for summary judgment and RWP to respond in order to give both parties time to review the signatures and the calculation.

¶9            In that supplemental motion, Jones pointed out that, as part of the initial motion for summary judgment, the trial court had struck the

---

[3] Although the motion argued that 1,078 signatures were invalid based on the false circulator affidavit, the parties later agreed that the correct number was 1,077.

[4] Although the court's minute entry indicated that ninety signatures belonged to voters not listed in the voter rolls, in the motion for summary judgment, Jones had indicated that this number was eighty-seven, and the court later corrected it.

signatures of eighty-seven individuals who were not registered to vote in Graham County when they signed the referendum petition but had proceeded to trial on ninety-three signatures for individuals whose addresses on the petition did not match the voter records. Jones explained that the additional twelve signatures he had discovered during trial preparations "were inadvertently included in [his] objection category for a 'mismatched address' when, in fact, they did not appear *at all* in the County's voter registration records." Jones therefore reasoned that the twelve signatures "cannot be counted." He also pointed out that, on the eve of trial, when counsel had sent RWP an email detailing this discrepancy, RWP suggested it would stipulate to the twelve "objections based upon signers who do not appear in the precinct register." Jones argued RWP could not "walk . . . back" the stipulation "because it did not anticipate losing on the Keith Leonard issue." And, Jones maintained that subtracting all the invalid signatures left RWP with 1,062 signatures, which was two short of the required 1,064.

¶10        In response, RWP conceded that the twelve signatures raised in the supplemental motion "were not those of registered voters in Graham County."[5] But RWP pointed out that of the ten signatures the trial court had originally struck as duplicates pursuant to the initial motion for summary judgment, seven were duplicative of signatures Leonard had obtained. Thus, RWP argued, when the court struck the Leonard signatures, "the copies of the 7 signatures that were gathered by other circulators and previously eliminated as duplicates [were] now the only valid signatures from those voters." (Emphasis omitted.) Adding those seven to the 1,062 Jones had conceded were valid, RWP reasoned there were 1,069 valid signatures, exceeding the requirement of 1,064. RWP also identified an additional twenty-two signatures that had been "misrepresented" in the initial motion for summary judgment and should not have been disqualified.

¶11        In reply, Jones argued that RWP was asking "to re-open this entire case" by contesting "scores of . . . signature-specific objections that have long been disclosed and were squarely raised in [the initial] motion for summary judgment." Jones asserted RWP had "waived any arguments

---

[5] After supplemental briefing was complete, the parties filed a stipulation acknowledging that one of the twelve signatures at issue in fact belonged to a registered voter at the time the referendum petition was signed. They therefore agreed the supplemental motion for summary judgment only concerned eleven signatures.

concerning signatures already deemed invalid" because it had not challenged them as part of the initial motion for summary judgment. Jones further asserted that he would suffer "immeasurable prejudice" by having to relitigate these issues. As to the seven duplicate signatures, Jones explained that the individuals had signed Leonard's petition first and he had sought summary judgment on the "second-in-time signature," such that both signatures should be disqualified. (Emphasis omitted.)

¶12 In May 2022, the trial court issued its under-advisement ruling denying Jones's request for injunctive relief. The court concluded RWP had waived its argument concerning the twenty-two signatures that were "misrepresented" in the initial motion for summary judgment. But, the court determined that RWP had not waived its argument about the seven duplicate signatures because it could not have been raised sooner and that there was "no legal basis for disqualifying those signatures." This resulted in 1,070 valid signatures, and the referendum petition qualified for the ballot. In June 2022, the court entered a final judgment incorporating its prior minute entries and rulings, and this appeal followed.

**Standard of Review**

¶13 We review a trial court's decision on a request for injunctive relief for an abuse of discretion. *Parker v. City of Tucson*, 233 Ariz. 422, ¶ 11 (App. 2013). However, we review questions of law concerning the interpretation and application of referendum statutes de novo. *Arrett v. Bower*, 237 Ariz. 74, ¶ 7 (App. 2015).

¶14 In Arizona, the power of referendum is reserved for qualified electors of cities, towns, and counties. Ariz. Const. art. IV, pt. 1, § 1(8). It "permits qualified electors to circulate petitions and refer legislation which has been enacted by their elected representatives to a popular vote." *Redelsperger v. City of Avondale*, 207 Ariz. 430, ¶ 8 (App. 2004). Because this power "permits a minority to forestall implementation of enacted legislation, it 'requires strict compliance with [applicable] constitutional and statutory requirements.'" *Maricopa Citizens Protecting Taxpayers v. Price*, 244 Ariz. 330, ¶ 8 (App. 2017) (alteration in *Price*) (quoting *W. Devcor, Inc. v. City of Scottsdale*, 168 Ariz. 426, 429 (1991)); *see also Comm. for Pres. of Established Neighborhoods v. Riffel*, 213 Ariz. 247, ¶ 6 (App. 2006) ("requires nearly perfect compliance"); *Sklar v. Town of Fountain Hills*, 220 Ariz. 449, ¶ 9 (App. 2008) (strict compliance required).

**Compliance with § 19-101(A)**

**¶15**        Jones first argues the trial court erred in dismissing his challenge to the text of the referendum petition. Specifically, he maintains that RWP's petition "plainly does not comply" with § 19-101(A)'s "straightforward directive to identify" the "county measure" at issue and the title of the measure being referred, rather than its entire text. We review de novo the grant of a motion to dismiss for failure to state a claim. *Coleman v. City of Mesa*, 230 Ariz. 352, ¶ 7 (2012).

**¶16**        Section 19-101(A) prescribes "the form for referring to the people by referendum petition a measure or item, section or part of a measure enacted by the legislature, or by the legislative body of an incorporated city, town or county." As relevant here, it requires the following language:

Petition for Referendum

        To the secretary of state (or to the corresponding officer for or on local, county, city or town measures):

        We, the undersigned citizens and qualified electors of the state of Arizona, respectfully order that **the senate (or house) bill No. _____ (or other local, county, city or town measure) entitled (title of act or ordinance, and if the petition is against less than the whole act or ordinance then set forth here the item, section, or part, of any measure on which the referendum is used)**, passed by the _____ session of the legislature of the state of Arizona, at the general (or special, as the case may be) session of said legislature, (or by a county, city or town legislative body) shall be referred to a vote of the qualified electors of the state, (county, city or town) for their approval or rejection at the next regular general election (or county, city or town election) and each for himself says . . . .

(Emphasis added.)

¶17        RWP's referendum petition stated:

Petition for Referendum

To the Graham County Election Director:[6]

We, the undersigned citizens and qualified electors of the state of Arizona, respectfully order that the **Zone Map Change REZ#832-21 (APN 114-19-008D), entitled "Zone Map Change REZ#832-21 (APN 114-19-008D). Request is to change the present "A" (General Land Use) Zone, site 5-6, to "M-X" (Unlimited Manufacturing Land Use) Zone for the purpose of operating offsite cultivation facility for medical marijuana dispensaries within existing greenhouse on property. Applicant is Heather Dukes. Site address is 26050 S. NatureSweet Ave., Willcox, AZ.",** passed by the Graham County Board of Supervisors at the June 21, 2021 regular Board of Supervisors' meeting and ratified at the June 28, 2021 regular Board of Supervisors' meeting, shall be referred to a vote of the qualified electors of the county for their approval or

---

[6] Article IV, part 1, § 1(9) of the Arizona Constitution provides: "Every initiative or referendum petition shall be addressed to the secretary of state in the case of petitions for or on state measures, and to the clerk of the board of supervisors, city clerk, or corresponding officer in the case of petitions for or on county, city, or town measures." In contrast, § 19-141(A) states, "The duties required of the secretary of state as to state legislation shall be performed in connection with such legislation by the city or town clerk, county officer in charge of elections or person performing the duties as such." We are aware of no case addressing this discrepancy. *See Robson Ranch Mountains, L.L.C. v. Pinal County*, 203 Ariz. 120, ¶ 26 (App. 2002) (identifying conflict). However, because Jones has not challenged the petition on this basis and because RWP had a legal basis—§ 19-141(A)—to address the petition to the election director, we decline to address the issue further.

rejection at the next regular county election and
each for himself says . . . .

(Emphasis added.)

**¶18** In granting the motion to dismiss on this issue, the trial court explained that § 19-101(A) "calls for the insertion of the title" but "[i]f the petition is against less than the whole act or ordinance then it is to set forth the item, section, or part of any measure on which the referendum was used." The court reasoned that "[t]he 'whole act' in this case was the entirety of the Board of Supervisors agenda" and "[t]he petition set forth the item, section, or part on which the referendum is used." The court continued, "Even if that is not a technically correct interpretation of the statute, the manner of compliance is not subject to the strict construction rule." And, the court concluded, "The manner of compliance here is within the bounds of what is permissible in the effort of the defendants to comply with the statutes."

**¶19** On appeal, Jones argues the trial court "misunderstood" § 19-101(A) and "mistakenly relied on the statute's directive that, 'if the petition is against less than the whole act or ordinance,' the description must 'set forth here the item, section, or part, of any measure on which the referendum is used.'" Jones reasons, "While the zoning measure was approved amid other matters considered by the Graham County Board of Supervisors, the zoning measure was certified as its own standalone measure."

**¶20** "Our goal in interpreting statutes is to give effect to the intent of the legislature." *Sell v. Gama*, 231 Ariz. 323, ¶ 16 (2013) (quoting *Est. of Braden ex rel. Gabaldon v. State*, 228 Ariz. 323, ¶ 8 (2011)). "If a statute's language is clear and unambiguous, we apply it without resorting to other methods of statutory interpretation." *Hayes v. Cont'l Ins. Co.*, 178 Ariz. 264, 268 (1994). Statutes "should be construed together with other related statutes," even if they "contain no reference one to the other." *State ex rel. Larson v. Farley*, 106 Ariz. 119, 122 (1970). However, "the expression of one or more items of a class indicates an intent to exclude all items of the same class which are not expressed." *Pima County v. Heinfeld*, 134 Ariz. 133, 134 (1982); *see also Welch v. Cochise Cnty. Bd. of Supervisors*, 251 Ariz. 519, ¶ 36 (2021) (applying this canon of construction to conclude legislature intentionally excluded remedies).

**¶21** Section 19-101(A) plainly prescribes the form of a referendum petition. *See Direct Sellers Ass'n v. McBrayer*, 109 Ariz. 3, 5-6 (1972) (statute

"prescribes what the petition for referendum shall contain, how it shall be signed, and by whom it shall be verified" (quoting *AAD Temple Bldg. Ass'n v. Duluth*, 160 N.W. 682, 684 (Minn. 1916))). It applies to "a measure or item, section or part of a measure enacted by the legislature, or by the legislative body of an incorporated city, town or county." § 19-101(A).

**¶22**         At issue here was a county measure, specifically, a rezoning request, REZ#832-21, which the Graham County Board of Supervisors approved in June 2021. *See* A.R.S. § 19-142(D) (explaining that "a person or organization may file a referendum petition against *the rezoning of a parcel of property*" upon approval of rezoning) (emphasis added). And RWP was challenging the entire rezoning, not a part thereof. Put another way, the measure at issue was not the Board of Supervisors' agenda, as the trial court found. *See Grosvenor Holdings L.C. v. City of Peoria*, 195 Ariz. 137, ¶ 14 (App. 1999) ("decision" in minutes is "referable act"). Indeed, RWP seemed to recognize as much by designating "Zone Map Change REZ#832-21 (APN 114-19-008D)" as the "measure" on the petition, without reference to the entirety of the Board of Supervisors' agenda. The court therefore erred in its interpretation of § 19-101(A), insofar as it concluded the measure at issue was the entire agenda. *See Arrett*, 237 Ariz. 74, ¶ 7.

**¶23**         RWP nevertheless argues that when § 19-101(A) is read in conjunction with § 19-121(E), the "logical conclusion . . . is that when there is not an ordinance resolution to identify a measure, the meeting minutes suffice for identification." Section 19-121(E) provides:

> For the purposes of this article and article 4 of this chapter, the measure to be attached to the petition as enacted by the legislative body of an incorporated city, town or county means the adopted ordinance or resolution signed by the mayor or the chairman of the board of supervisors, as appropriate, and signed by the clerk of the municipality or the clerk of the board, as appropriate, or, in the absence of a written ordinance or resolution, that portion of the minutes of the legislative body that is approved by the governing body and filed with the clerk of the governing body and that reflects the action taken by that body when adopting the measure. In the case of zoning measures, the measure shall also include a legal description of

the property and any amendments made to the
ordinance by the legislative body.

**¶24** Even assuming we must construe the two statutes together, *see Larson*, 106 Ariz. at 122; *Heinfeld*, 134 Ariz. at 134, we find RWP's argument unpersuasive. Section 19-121(E) discusses "the measure to be attached to the petition." *See Simpson v. Comm. Against Unconstitutional Takings, L.L.C.*, 193 Ariz. 391, ¶ 13 (App. 1998) (interpreting § 19-121(E) to mean: "If the ordinance or resolution has been adopted, attach that to the referendum petition; in the absence of a written ordinance or resolution, attach the approved minutes."). Here, by contrast, we are concerned with the language describing the measure, including the "title of act or ordinance" or "the item, section, or part, of any measure on which the referendum is used," as used in the text of the referendum petition itself. § 19-101(A). Indeed, § 19-101(A) separately requires "the title and text of the measure [to be] attached" to the petition. From a practical standpoint, it makes sense that the minutes, which can sometimes be lengthy and hard to understand, would be attached to but not included in the text of a petition. Section 19-121(E) therefore does not support RWP's position that the Graham County Board of Supervisors' meeting minutes could be used as the required language on the petition.

**¶25** Next, Jones asserts that strict compliance with § 19-101(A) was necessary. Jones contends the trial court's conclusion that "the manner of compliance is not subject to the strict construction rule" is a "patently incorrect statement of [the] law." He argues the court erroneously relied on "*Sklar*'s discussion of the need to 'broadly construe' the terms of referendum statutes," notwithstanding the fact the legislature has subsequently made clear in A.R.S. § 19-101.01 that "strict compliance is the law, and failure to strictly comply is fatal to the measure."[7]

**¶26** In *Sklar*, which was decided in November 2008, this court noted that "[o]ur supreme court has consistently held that a referendum petition must 'comply strictly with applicable constitutional and statutory provisions.'" 220 Ariz. 449, ¶ 9 (quoting *Sherrill v. City of Peoria*, 189 Ariz. 537, 540 (1997)). But, we also noted that our legislature had expressly

---

[7]RWP suggests that Jones did not raise this argument below but does not argue that we should consider the issue waived. Although Jones did not apparently argue that *Sklar* was no longer good law before the trial court, he did rely on § 19-101.01 and maintained that strict compliance with § 19-101(A) was required. We decline to find waiver.

directed, in a note to A.R.S. § 19-111, that referendum requirements should be "broadly construed." *Id.* ¶ 10 (quoting *Sherrill*, 189 Ariz. at 540-41). In an attempt to harmonize these two standards, this court explained that we must strictly construe the statutory requirements but broadly construe the terms used in the statutes to identify those requirements. *Id.* ¶ 11. In 2015, after *Sklar* was decided, our legislature added § 19-101.01, which mandates "that the constitutional and statutory requirements for the referendum be strictly construed and that persons using the referendum process strictly comply with those constitutional and statutory requirements." *See* 2015 Ariz. Sess. Laws, ch. 285, § 1.

**¶27**        As a starting point, we determine whether *Sklar*'s proposition that we must broadly construe the terms used in the referendum statutes can coexist with the explicit requirements of § 19-101.01. Section 19-101.01 requires strict compliance with "the constitutional and statutory requirements for the referendum process." Notably, our caselaw established that same proposition even before § 19-101.01 was enacted. *See Sklar*, 220 Ariz. 449, ¶ 9. Section 19-101.01, however, does not address how we interpret the terms used in those constitutional and statutory requirements to determine their ultimate meaning.

**¶28**        That said, the proposition that we broadly interpret terms used in the statutory requirements for referendums was based on a prior note to § 19-111. *See Sklar*, 220 Ariz. 449, ¶ 10. But that note was removed,[8] and our legislature enacted § 19-101.01, emphasizing the need for strict compliance. *See State v. Superior Court*, 104 Ariz. 440, 442 (1969) (when legislature amends existing statute, we presume it was aware of prior judicial interpretations of statute); *State v. Averyt*, 179 Ariz. 123, 128

---

[8]The note was originally included as a statement of purpose with legislative amendments to title 19, chapter 1. 1989 Ariz. Sess. Laws, ch. 10, §§ 1, 2. It was not numbered and subsequently appeared under the heading "Historical and Statutory Notes," as late as 2015. *See, e.g.*, *Sklar*, 220 Ariz. 449, ¶ 10. To the extent this statement of purpose was enacted as part of our prior law, the legislature's subsequent adoption of § 19-101.01 seemingly repealed it by implication. *See Hounshell v. White*, 219 Ariz. 381, ¶ 13 (App. 2008) (repeal by implication results where subsequent statute covers same subject matter and earlier statute not explicitly retained); *see also* A.R.S. § 1-245. In any event, we need not resolve the issue here because our opinion does not turn on the ongoing validity of that statement or the reasoning in *Sklar*.

(App. 1994) ("Under the rules of statutory construction, when the legislature modifies the language of a statute, there is a presumption that a change in the existing law was intended."). Thus, the proposition that we broadly construe the terms in the referendum statutes appears to be no longer good law. The trial court therefore erred in concluding that the rule of strict compliance does not apply here. *See Romer-Pollis v. Ada*, 223 Ariz. 300, ¶ 12 (App. 2009) (court abuses discretion by committing error of law).

¶**29**     However, we decline to conclude that the presence of any surplus information on a referendum petition automatically negates strict compliance under § 19-101(A). Nothing in the plain language of § 19-101(A) mandates such a result. Further, in this instance, the surplusage does not alter the meaning or cause confusion. *See Pioneer Tr. Co. of Ariz. v. Pima County*, 168 Ariz. 61, 67 (1991); *see also Sklar*, 220 Ariz. 449, ¶ 17 ("The purpose of [§ 19-101(A)] is to ensure that the public has immediate and full disclosure of the exact public action that may be reversed."). As our supreme court concluded in *Pioneer Trust*, "Absent constitutional or statutory proscription of such surplusage, we choose not to silence the voice of the people because of it." 168 Ariz. at 67.

¶**30**     RWP's referendum petition contained the required information under § 19-101(A). It identified the relevant rezoning request, including details of when it had been passed and by whom. Although the petition included the title of the rezoning request twice, as well as the entire proposal, this additional information did not alter the meaning and "does not justify depriving [Graham] County voters of their opportunity to be heard." *Pioneer Tr.*, 168 Ariz. at 67. If anything, this additional information served to better inform the signers of the matter at issue. *See Sklar*, 220 Ariz. 449, ¶ 17. In addition, although the petition lacked the phrase "county measure," or something similar, it was clear based on the remainder of the petition—namely the address of the property and the involvement of the Graham County Board of Supervisors—that what was at issue was a county matter.

¶**31**     In sum, we conclude that the form of a referendum petition must strictly comply with § 19-101(A) and that RWP so complied here, despite its inclusion of surplus information. Accordingly, the trial court did not err in granting the motion to dismiss on this issue. *See Coleman*, 230 Ariz. 352, ¶ 7; *see also Forszt v. Rodriguez*, 212 Ariz. 263, ¶ 9 (App. 2006) (we may affirm trial court if legally correct for any reason apparent in record).

**Sufficient Valid Signatures**

¶32        Jones next contends that the "trial court erred in granting post-trial judgment" for RWP on the signature challenge.  Specifically, he raises three issues:  (1) the court "failed to shift the burden of proof to [RWP] to prove the validity of signatures containing mismatched addresses"; (2) RWP "waived its post-trial argument to revive seven 'duplicate' signatures that [it had] conceded, during summary judgment briefing, were invalid"; and  (3) the court misinterpreted "the duplicate signature prohibition in A.R.S. § 19-121.02."  We address each issue in turn.

¶33        The first issue concerns ninety-three signatures with an address on the referendum petition that did not match the signer's address in the voter registration records.  Below, Jones presented evidence of these mismatched addresses in his motion for summary judgment.  In response, RWP asserted, in a footnote, that "[i]t is not clear that a failure to update a voters' registration address automatically invalidates their signing of a referendum petition."

¶34        In denying the motion for summary judgment on these signatures, the trial court stated:

> As to the signatures for which the addresses do not match the voter registration, the court finds that those signatures are presumed to be valid.  The requirement is that those people be qualified electors.   By identifying those people as being potentially the same people, who have simply moved within Graham County, the plaintiffs implicitly concede the likely validity of those signatures.
>
> Also, the petition calls for the "current residence address" of the signers.  It's difficult for the court to see how it's fair to presume a signature invalid where the signer provided exactly the information the sign[e]r was instructed to provide.
>
>          . . . .
>
>          . . . [T]he plaintiffs are free to present evidence to the court, or argue to the court

based on the evidence that's already present in the record, that those signatures should not count. At this point the court cannot say that those 93 signatures are either valid or invalid.

**¶35**         On appeal, Jones maintains that his "position is not that a signature is invalid simply because an otherwise qualified elector has moved after signing." Rather, he argues, "[I]t is impossible to determine, on the face of the petition vis-à-vis voter registration rolls, whether the John Smith who signed the petition as a resident of 123 Main Street is a qualified elector if no John Smith is registered at that address." Because "[i]t is uncontested that, as to dozens of signers, no voter by the same name appeared registered at the address listed on the petition," Jones reasons that this "discrepancy displaced the presumption of validity as to these signatures and shifted the burden to [RWP] to re-establish their validity."

**¶36**         In support of his burden-shifting argument, Jones relies on *Jenkins v. Hale*, 218 Ariz. 561, ¶ 23 (2008), and *McKenna v. Soto*, 250 Ariz. 469, ¶ 18 (2021). But these cases are distinguishable. Procedurally, neither case was before the trial court on summary judgment. *See Jenkins*, 218 Ariz. 561, ¶ 4; *McKenna*, 250 Ariz. 469, ¶ 1. Substantively, *Jenkins* involved signatures that listed a post-office box, rather than the required residential address, 218 Ariz. 561, ¶ 18, while *McKenna* involved signatures with incomplete dates, 250 Ariz. 469, ¶ 15. Both cases, therefore, involved issues that were facially fatal.

**¶37**         "In Arizona, a summary judgment motion sets in play shifting burdens." *Nat'l Bank of Ariz. v. Thruston*, 218 Ariz. 112, ¶ 12 (App. 2008). The moving party bears the initial burden of showing "there are no genuine issues of material fact and it is entitled to summary judgment as a matter of law." *Id.* "Only if the moving party satisfies this burden will the party opposing the motion be required to come forward with evidence establishing the existence of a genuine issue of material fact that must be resolved at trial." *Id.* The moving party bears the heavy burden of persuasion, and that burden does not shift to the non-moving party. *Id.* ¶¶ 16-17. In reviewing a motion for summary judgment, we must determine de novo whether the trial court erred in applying the law. *Bothell v. Two Point Acres, Inc.*, 192 Ariz. 313, ¶ 8 (App. 1998).

**¶38**         As RWP points out, the only evidence Jones presented in support of his claim as to these ninety-three signatures was the mismatched addresses in the voter rolls. The trial court seemed to suggest that Jones had failed to meet his initial burden because the signers listed an address

that was presumably their "current residence address," regardless of what address they had previously used when registering to vote. We agree that, despite different addresses being listed in the voter registration records, there is nothing facially fatal about these signatures. *See* § 19-101(A) (requiring signer to provide "[a]ctual address" or description of "residence location"); § 19-121.02(A)(1) (county recorder may reject signatures where "[n]o residence address or description of residence location is provided"). And it is not clear from the record what version of the registration records Jones used for the address comparison—the current version as of the filing of the court action, the version as of the signing of the petition, or something else entirely. *See* § 19-122(B) (most current version of voter registration database at time of filing of court action challenging referendum petition constitutes "official record" to be used to determine eligibility, but if that address differs, county recorder must also examine version of database that was current as of date signer signed petition). Because Jones failed to show there were "no genuine issues of material fact" with regard to his claim that the signatures were invalid, the burden of establishing a genuine issue did not fall to RWP. *Nat'l Bank of Ariz.*, 218 Ariz. 112, ¶¶ 12, 17. The court therefore did not err in denying the motion for summary judgment. *See Bothell*, 192 Ariz. 313, ¶ 8.

¶39 The second and third issues concern seven duplicate signatures that were collected by Leonard and a separate circulator. These signatures were part of the ten signatures the trial court had disqualified under the initial motion for summary judgment. At that time, the court denied the motion for summary judgment on Leonard's circulator affidavit. After the court had invalidated all the petition sheets circulated by Leonard at trial, and after the court had granted the parties leave to file supplemental pleadings on the additional twelve signatures that were not in the voter rolls, RWP raised this new issue with respect to the seven duplicate signatures. RWP maintained that because the court had invalidated the signatures on the Leonard petitions, the duplicate signatures, collected by a different circulator, should not be disqualified.

¶40 The trial court agreed with RWP, explaining that there was "no legal basis for disqualifying" the seven signatures after the Leonard petitions had been disqualified. The court explained that it was not going to treat this argument as waived because it "could not have been made in response to the pre-hearing summary judgment motion," given that the Leonard petitions had not yet been struck. The court further determined that RWP had timely raised the issue because "no final ruling was made at

the hearing."  The court further pointed out that Jones had a "full and fair opportunity to be heard in response."

¶41        On appeal, Jones reurges his argument that RWP waived any issue related to these seven signatures.  He points to caselaw discussing partial summary judgment rulings and "the need for parties to be able to rely on those rulings in preparing for trial."  And, Jones maintains he focused his "trial preparation and presentation on evidence showing that the address that Leonard listed on his petition sheets was not his actual residence" and "did not present evidence concerning the 93 signatures containing mismatched addresses, as this would have been superfluous."

¶42        The rule of waiver "is a rule of prudence, not of jurisdiction." *City of Tucson v. Clear Channel Outdoor, Inc.*, 209 Ariz. 544, n.9 (2005).  When good reason exists, a court may entertain waived issues. *Jimenez v. Sears, Roebuck & Co.*, 183 Ariz. 399, 406 n.9 (1995).  Whether to apply the doctrine of waiver is largely a discretionary decision for the court considering it. *See Hawkins v. Allstate Ins. Co.*, 152 Ariz. 490, 503 (1987).

¶43        At the hearing on the motion for summary judgment, the trial court entered its orders in an unsigned minute entry.  As the court pointed out, its orders were therefore subject to change. *See* Ariz. R. Civ. P. 54(b); *BCAZ Corp. v. Helgoe*, 194 Ariz. 11, ¶ 14 (App. 1998) (interlocutory or intermediate order subject to change prior to final judgment); *Reilly v. Perkins*, 6 Ariz. 188, 190 (1899) (until final judgment, proceedings are subject to change and modification; interlocutory order or decree "is always under the control of the court until the final decision of the suit, and may be modified or rescinded upon sufficient grounds shown at any time before final judgment").  And in light of later events at trial—specifically, the disqualification of the petition sheets circulated by Leonard—the court determined that its original summary judgment ruling needed to be modified.  The court therefore had a sound reason—and a legal basis—for declining to apply waiver.

¶44        It is significant that Jones was afforded an opportunity to respond to RWP's argument—and in fact did so—through his reply in support of his supplemental motion for summary judgment. *See Stokes v. Stokes*, 143 Ariz. 590, 592 (App. 1984) (doctrine of waiver intended to prevent surprise).  In addition, the trial court allowed Jones to present arguably tardy evidence about the additional twelve signatures of individuals who were not in the voter rolls that, Jones maintained, should be disqualified pursuant to the court's earlier grant of summary judgment. *Cf. State v. Ross*, 166 Ariz. 579, 584 (App. 1990) ("essential fairness" underlies

system of justice). We therefore cannot say the court abused its discretion in declining to deem this argument waived. *See Hawkins*, 152 Ariz. at 503.

¶45 The final issue concerns § 19-121.02(A), which provides that, after receiving referendum petition signature sheets, the county recorder "shall determine which signatures of individuals whose names were transmitted shall be disqualified." The statute further provides, in relevant part, that "[i]f a petitioner signed more than once, all but one otherwise valid signature shall be disqualified." § 19-121.02(A)(8).

¶46 Below, Jones argued, "[I]f a person signs a referendum petition more than once, only the first signature collected by that person should be eligible to be counted." And, according to Jones, with respect to the seven signatures, because those individuals signed Leonard's petition first, the first was invalid based on the false circulator affidavit and the second was invalid as being a duplicate. The trial court disagreed, explaining § 19-121.02(A)(8) "says to count 'one signature' that is valid but for the fact that it is duplicative." The court continued, "There is no basis in the statute's text for disqualifying all duplicative signatures."

¶47 On appeal, Jones again contends that § 19-121.02(A)(8), when "combined with the 'strict compliance' standard to which referenda signatures are held, . . . logically suggests that only the first signature obtained from a duplicate signer should be counted." (Emphasis omitted.) Jones maintains that the trial court's "alternative interpretation . . . fails to recognize the important policy reasons behind eliminating second-in-time signatures." Specifically, Jones asserts that "[f]ailure to eliminate all but the first signature incentivizes initiative or referendum sponsors to have individuals sign the same petition as many times as possible because if one of the earlier-in-time duplicates is eliminated on other grounds, the later-in-time signatures can serve as back-ups."

¶48 Section 19-121.02(A)(8) plainly requires the county recorder to disqualify "all but one otherwise valid signature" if the person signed more than once. It does not specify which signature must be invalidated. "[W]e will not read into a statute something which is not within the manifest intent of the legislature as indicated by the statute itself." *City of Tempe v. Fleming*, 168 Ariz. 454, 457 (App. 1991). "Nor will we 'inflate, expand, stretch or extend a statute to matters not falling within its express provisions.'" *Id.* (quoting *City of Phoenix v. Donofrio*, 99 Ariz. 130, 133 (1965)). Accordingly, the trial court correctly interpreted § 19-121.02(A)(8) as allowing the disqualification of the first signature. *See Arrett*, 237 Ariz. 74, ¶ 7. And we need not resort to Jones's policy arguments, given that the

language of the statute is plain and unambiguous. *See Hayes*, 178 Ariz. at 268.

## Conclusion

**¶49** For the foregoing reasons, we affirm the trial court's denial of Jones's request for injunctive relief, permitting referendum petition REF-02-2021 to be placed on the November 2022 ballot.